IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



CRESCENT RESOURCES LITIGATION
TRUST by and through Dan Bensimon, Trustee,
Plaintiff,

-vs-                                              Case No. A-12-CA-009-SS

DUKE ENERGY CORPORATION; DUKE
VENTURES, LLC; SPECTRA ENERGY
CAPITAL, LLC f/k/a Duke Capital, LLC; DUKE
VENTURES, INC.; DUKE ENERGY
CAROLINAS, LLC; DUKE ENERGY
CAROLINAS; B. KEITH TRENT; JIM W.
MOGG; ARTHUR W. FIELDS; and R. WAYNE
McGEE,
Defendants.

## O R D E R

BE IT REMEMBERED on the 19th of September, 2013, the Court called a hearing in the
above-styled cause, and the parties appeared by and through counsel. Pending before the Court are
the following summary judgment motions: Duke Energy Corporation, Duke Ventures, LLC, and
Spectra Energy Capital, LLC (collectively, Duke)'s Motion for Summary Judgment [#157], Plaintiff
Crescent Resources Litigation Trust's Sealed Response [#181], Duke's Reply [#185], the Trust's
post-hearing Letter Brief [#191], and Duke's post-hearing Letter Brief [#192]; Duke's Motion for
Leave to Exceed Page Limit [#184]; and Defendant Arthur W. Fields's Corrected Motion for



Summary Judgment [#165], and the Trust's Motion for Leave to File Sealed Document (Trust's Response) [#193].[1]

Also pending are the following *Daubert* motions: Fields's Motion to Exclude Expert Testimony of K.C. Conway [#122]; Fields's Motion to Exclude Expert Testimony of Patricia Caldwell [#123]; Fields's Motion to Exclude Expert Testimony of D. Paul Regan [#129]; Duke's Motion to Exclude Expert Testimony of Patricia Caldwell [#133], the Trust's Sealed Response [#146], and Duke's Reply [#153]; Duke's Motion to Exclude Expert Testimony of Charles Graham [#134], the Trust's Sealed Response [#148], and Duke's Reply [#152]; Duke's Motion to Exclude Expert Testimony of K.C. Conway [#135], the Trust's Sealed Response [#147], and Duke's Reply [#151]; Duke's Motion to Exclude Expert Testimony of D. Paul Regan [#137], the Trust's Sealed Response [#150], and Duke's Reply [#154];  Duke's Motion to Exclude Expert Testimony of Stephen Becker [#162], the Trust's Sealed Response [#176], and Duke's Reply [#174]; Duke's Motion to Exclude Supplemental Opinions of K.C. Conway [#178], the Trust's Response [#183], and Duke's Reply [#188]; and Fields's Motion to Exclude Supplemental Opinions of K.C. Conway [#179], and the Trust's Response [#183]. Having reviewed the documents, the arguments of the parties at the hearing, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

---

[1] Fields's Motion was filed on August 8, 2013. On August 15, 2013, the parties filed an agreed motion to extend the Trust's response deadline to September 20, 2013, which the Court granted the next day. However, at the hearing, when the Court asked the Trust for its argument in response to Fields's motion, the Trust represented the parties had agreed (without notice to the Court, much less a motion) to extend the Trust's response deadline again, apparently to September 27, 2013. The Court thus heard argument on Fields's motion without the benefit of any written response from the Trust, and seemingly without any written response being substantially ready for submission (as the Court had anticipated given the agreed filing deadline the day after the hearing).

## Background

**A.     The Duke Transaction**

In the 1960s, Duke Energy Corporation acquired approximately 300,000 acres of land in rural areas of North Carolina and South Carolina. Beginning in 1969, Duke Energy Corporation contributed this land to Crescent Resources' predecessor-in-interest, Crescent Land and Timber Company. Since then, Crescent Resources has developed, owned, leased, managed, and sold real estate. Prior to September 2006, Crescent Resources, LLC was a wholly owned indirect subsidiary of Duke Energy Corporation.  Duke Energy Corporation wholly owned Duke Capital, LLC, which wholly owned Duke Ventures, LLC, which wholly owned Crescent Resources.  Over the years, the Crescent enterprise branched out into additional geographic areas and acquired additional properties. The core of Crescent Resources' business was to take large parcels of real estate, install extensive infrastructure and capital-intensive amenities, and then sell the lots to homebuilders or individuals. Crescent Resources eventually expanded geographically and into the development of commercial and retail projects.  Customarily, Crescent Resources created single-purpose entities for each of its developments, and as a result, in 2006, Crescent Resources operated roughly 100 projects through approximately 120 entities, many of which are debtors in this proceeding.

On September 7, 2006, a Formation and Sale Agreement was entered into by Duke Ventures, LLC, Crescent Resources, and several Morgan Stanley real estate investment entities whereby the parties agreed: (a) Crescent Resources had, pre-transaction, an enterprise value of $2.075 billion; (b) Duke would form Crescent Holdings and contribute all of its membership interests in Crescent Resources to Crescent Holdings; (c) Crescent Holdings would contribute all of its membership interests in itself to Duke Ventures; (d) Crescent Resources would enter into the 2006 Credit

-3-

Agreement (defined below), from which $1.187 billion in term loan proceeds would be distributed to Crescent Holdings, with Crescent Holdings then distributing such proceeds directly to Duke;[2] (e) Morgan Stanley Real Estate Fund (MSREF) would purchase 49% of the membership interests in Crescent Holdings from Duke for $414 million; and (f) Crescent Holdings would enter into an employment agreement with Arthur Fields which provided, among other things, for the issuance to Fields of 2% of the membership interests in Crescent Holdings. At the time, the parties referred to this arrangement as "Project Galaxy." The project has since lost some of its cosmic luster, and the parties now refer to the deal as the more antiseptic "2006 Duke Transaction."

As part of the 2006 Duke Transaction, Crescent Holdings and certain of its subsidiaries entered into the above-mentioned 2006 Credit Agreement among Bank of America, N.A. as administrative agent and collateral agent, the lenders' party thereto from time to time as lenders, Crescent Resources as the borrower, and Crescent Holdings and certain of its subsidiaries as guarantors, whereby Crescent Resources received: (a) $1.225 billion in term loan proceeds; (b) a $200 million unfunded revolving credit commitment; and (c) a letter of credit subfacility commitment not to exceed $100 million.  From the proceeds of the $1.225 billion in term loans, $1.187 billion was distributed to Duke as described above, with such proceeds being ultimately distributed to its parent, Duke Capital, LLC. The original lenders under the 2006 Duke Transaction also sold portions of the loan to numerous other syndicate lenders. As a continuation of the 2006 Duke Transaction, liens were granted to Crescent Resources' pre-petition lenders on depository accounts in 2007, and mortgages on real property of Crescent Resources and certain subsidiaries

---

[2] It is undisputed the documents called for a distribution of funds to Crescent Resources, who would pass the funds on to Crescent Holdings, who would pass the funds on to Duke. The Trust alleges this did not occur, and Crescent Resources instead transferred the loan proceeds directly to Duke, bypassing Crescent Holdings.

were created in 2008. The Trust alleges this entire transaction put $1.6 billion in cash into the pockets of Duke and simultaneously rendered Crescent Resources insolvent.

**B.    Arthur Fields's Involvement**

Fields joined the Crescent enterprise in 1988. By 1991 he had become President of the predecessor company which would go on to become Crescent Resources in 2000. In 2002, Fields became Chief Executive Officer of Crescent Resources. Fields was also one of three members of Duke Ventures's Board of Managers. Finally, Fields was involved in the 2006 Duke Transaction, as he received an ownership stake in Crescent Holdings under the terms of the transaction. The "Action by Written Consent of the Board of Managers of Crescent Resources" dated September 7, 2006—the paperwork approving the 2006 Duke Transaction on behalf of Crescent Resources—expressly acknowledged Fields's conflict of interest in the transaction. Pl.'s Resp. [#193-1], Ex. AE, at 3.

As CEO of Crescent Resources, Fields's approval of the 2006 Duke Transaction was necessary for the completion of the project. Fields represents he relied on his decades of experience in the industry in evaluating the 2006 Duke Transaction, as well as Morgan Stanley's valuation of Crescent Resources, and concluded the numbers made sense and the transaction could move forward. Fields also states he evaluated alternative ways of structuring the transaction. Based exclusively on his own statements in his affidavit, Fields contends he acted in good faith and made reasonably informed business decisions after fairly considering all the information available to him at the time.

Fields's role in the 2006 Duke Transaction cannot be fully understood without some examination of his prior dealings with Duke and Crescent Resources. In 1998, Fields and Crescent entered into an "Amended and Restated Employment Agreement." *Id.*, Ex. AA. The 1998

Employment Agreement was structured to provide Fields with, as a portion of his compensation, a percentage of "Net Cash Flow" and "Net Proceeds" of each "Company Project." *Id.* ¶ 2.7. Company projects included "real estate development venture[s]" which were "commenced" during Fields's tenure, but excluded "sale[s] of undeveloped land." *Id.*

On September 7, 2006, Fields, Crescent Resources, and Duke entered into a new Employment Agreement. *Id.*, Ex. AB. This new agreement extinguished Fields's prior agreement, and provided him with a credit of $37,796,000.00 to his Duke retirement account and the two percent stake in Crescent Holdings in exchange for his continued employment. *Id.* Fields represents Duke independently determined he was owed $55 million based upon termination of the 1998 Employment Agreement, and subtracted roughly $17 million from that amount to pay for the two percent stake in Crescent Holdings. Fields's Mot. Summ. J. [#165-2], Ex. B (Fields Aff.), ¶¶ 15–16. The Trust contests the validity of Duke's calculations, arguing Duke overvalued Crescent's real estate portfolio and essentially gave Fields a percentage of funds Fields was not entitled to under his employment agreement.

Also relevant is the Limited Liability Company Agreement of Crescent Resources. Fields's Mot. Summ. J. [#165-1], Ex. A-1. The LLC Agreement states Crescent Resources is a Georgia LLC. *Id.* The agreement also includes an exculpation clause, which states the Board Members, officers, and directors of Crescent Resources shall not be liable for damages for actions taken on behalf of Crescent Resources unless those actions were performed "fraudulently or constituted gross negligence or willful misconduct." *Id.*

Fields resigned as CEO of Crescent Resources on May 29, 2009. Because Fields retired before the vesting of his two percent stake in Crescent Holdings, Fields represents he forfeited his $17 million "investment" in Crescent Holdings.

## C.     The Crescent Bankruptcy

On June 9, 2009, Crescent Holdings, Crescent Resources, and various subsidiaries filed for bankruptcy. The Bankruptcy Court ultimately approved the Debtors' Plan. The Plan gives the original lenders and their successors full ownership of Crescent Holdings and Crescent Resources post-bankruptcy. The Plan also gives the lenders $961 million in unsecured claims, based on the value of their claims under the 2006 Credit Agreement less the value of Crescent Holdings at the time of the confirmation. The Plan also formed the Trust, and authorized the Trust to pursue claims against parties other than the original lenders, who were fully released from liability.

The beneficiaries of the Trust are divided into two classes. Class A creditors are those creditors who have claims against Crescent *not* based on the 2006 Credit Agreement. The value of these claims is approximately $279 million. Class B creditors are the original lenders and their various successors. The value of these claims is approximately $961 million.

Both Duke and Fields now move for summary judgment in separate motions raising distinct grounds.

## Analysis

## I.     Motion for Summary Judgment—Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant

-8-

and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.   Duke's Motion

The Trust's Sealed Second Amended Complaint [#114] asserts numerous causes of action against Duke. Relevant to Duke's current motion are the first four counts. Count One and Count Two allege "constructive" and "actual intent" fraudulent transfers to Duke. Through these claims, the Trust seeks to avoid the transfer of the $1.187 billion from Crescent (either Holdings or Resources) to Duke, as well as an additional $5.5 million in expenses transferred by Crescent to Duke. 2d Am. Compl. [#114] ¶¶ 196–205. Similarly, Count Three and Count Four, having been trimmed down by a motion to dismiss, allege a fraudulent transfer of approximately $15 million made to Bank of America for the benefit of Duke.

The basis for all four claims is Section 544(b)(1) of the Bankruptcy Code, which provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). This statute serves as "a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy." *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 156 (S.D. Tex. 2009). "The trustee's successor rights arise under federal law, but the extent of those rights depends entirely on applicable state law." *In re IFS Fin. Corp.*, 669 F.3d 255, 261 (5th Cir. 2012) (internal quotation marks omitted). The parties agree the relevant state law here is North Carolina law, which

generally applies the Uniform Fraudulent Transfer Act adopted by North Carolina and most other states.

Duke's motion raises a number of arguments in favor of summary judgment, but those arguments generally fall in one of two categories. First, Duke contends Section 546(e) of the Bankruptcy Code exempts certain transactions from avoidance by the trustee. Duke argues the 2006 Duke Transaction qualifies under two separate categories of transactions exempted by Section 546(e), and thus the Trust is barred from recovering on those claims through fraudulent transfer actions. Second, Duke argues the Trust cannot recover the $961 million sought for the Class B creditors because, under North Carolina law, the original lender banks could never bring claims to avoid the transfers they participated in as fraudulent. Alternatively, Duke asserts Section 550 of the Bankruptcy Code precludes a recovery of a billion dollar windfall on equitable grounds, even if the transfers are otherwise avoidable under Section 544(b)(1).

## A.    Section 546(e) Exemptions

Section 546(e) of the Bankruptcy Code reads, with the judicious use of ellipses:

> Notwithstanding section[] 544 . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution . . . or that is a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). Section 546(e) thus affords "a complete defense to avoidance claims brought by a Trustee," if the requirements of the particular exemption are satisfied. *In re Olympic Natural Gas Co.*, 294 F.3d 737, 740 (5th Cir. 2002).

-10-

Parsing the dense language of the statute, Section 546(e) provides two exemptions potentially relevant here. First, Section 546(e) exempts any transfer which constitutes a settlement payment by or to a financial institution. 11 U.S.C. § 546(e). Second, Section 546(e) exempts any transfer made by or to a financial institution in connection with a securities contract. *Id.* Duke argues both exemptions are properly applied to the 2006 Duke Transaction.

## 1.     Settlement Payment Exemption

Turning to Duke's first argument, the parties do not dispute the billion dollar transfer at issue in this case was made by or to a financial institution. Wachovia Bank received the term loan proceeds from Bank of America (a joint lender along with Morgan Stanley), and passed the funds along to JPMorgan Chase Bank. The Trust does not contest all of those banks qualify as financial institutions under the statute. The only issue, therefore, is whether the transfer constitutes a "settlement payment."

The Bankruptcy Code provides one definition of the term settlement payment relevant here. The definition reads: "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). Despite this completely unhelpful definition, "[m]ost courts agree that the Code's understanding of a settlement payment is 'extremely broad' and encompasses 'most transfers of money or securities made to complete a securities transaction.'" *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 815 (N.D. Tex. 2012) (quoting *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985–86 (8th Cir. 2009)); *see also Olympic*, 294 F.3d at 742 (endorsing a broad reading of the phrase); *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515–16 (3d Cir. 1999) (repeating

the "extremely broad" characterization and holding "the term 'settlement payment' is a broad one that includes almost all securities transactions"); COLLIER ON BANKRUPTCY P 546.06[2][b] (Alan N. Resnick & Henry J. Sommer eds.,16th ed. 2013) (phrase "should be interpreted very broadly," and "includes any transfer of securities toward the completion of a securities transaction, including routine securities transactions and more complicated transactions such as the transfer of consideration in a leveraged buyout transaction" (footnotes omitted)).

Duke argues the 2006 Duke Transaction is essentially indistinguishable from the transaction deemed to be an exempted settlement payment in *Verizon*. 892 F. Supp. 2d at 815–16. Verizon decided to spin-off its directories business into a separate company. *Id.* at 807. To accomplish the spin-off, Verizon created a new corporation named Idearc. *Id.* at 809. Verizon transferred ownership of its directories business to Idearc by giving Idearc all of its stock in another Verizon wholly owned subsidiary, Idearc Information Services, LLC. *Id.* at 815. In exchange, Idearc gave Verizon $2.4 billion in cash (most of it borrowed for this purpose), another $7.15 billion in debt, and all of Idearc's stock. *Id.* at 810. Idearc ultimately collapsed and declared bankruptcy. *Id.* A litigation trust was created to pursue claims against Verizon, and the trust filed suit seeking to avoid the $2.4 billion in cash Idearc paid to Verizon as a fraudulent transfer. *Id.* at 814.

The *Verizon* court granted summary judgment for Verizon on the fraudulent transfer claims, relying exclusively on Section 546(e). *Id.* at 815–16. The court held "the cash that Idearc paid to [Verizon] at the time of the spin-off was a settlement payment, because it 'completed a securities transaction.' In the spin-off, Verizon gave Idearc the directories business, in the form of stock in Idearc Information Services, LLC ("IIS"), and in return Idearc gave Verizon cash, debt, and Idearc stock." *Id.* at 815. The court subsequently rejected numerous arguments made by the

-12-

trust—including arguments the spin-off payment was not a settlement payment because it was not the type of transaction Congress intended to exempt, and because it was a "'non-arm's-length intercompany transaction,'"—as unsupported by the text of Section 546(e) and relevant circuit case law. *Id.* at 816–17.

The Trust first argues there was no settlement payment made in this case because Crescent Resources simply made "[a] one-way distribution or dividend" to Duke and received nothing in return. In the Trust's view, the transfer of the bulk of the term loan proceeds to Duke was essentially a gift (or perhaps an extortion payment), not an exchange of value indicating the completion of any securities transaction. In support of this position, the Trust cites two district court and two bankruptcy court cases which refused to apply Section 546(e)'s settlement payment exemption to dividend payments. *See Grede v. FCStone, LLC*, 485 B.R. 854 (N.D. Ill. 2013); *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289 (D. Del. 2012); *In re Global Crossing, Ltd.*, 385 B.R. 52 (Bankr. S.D.N.Y. 2008); *In re Integra Realty Res., Inc.*, 198 B.R. 352 (Bankr. D. Colo. 1996).

The first problem the Trust encounters is its own strained reading of the 2006 Duke Transaction. The Formation and Sale Agreement designed a large transaction involving multiple moving parts, but each part was to be moved before the transaction was considered closed. Thus, in describing the "Closing Actions," the Formation and Sale Agreement listed the following: (1) the exchange of membership interests between Duke, Crescent Holdings, and Crescent Resources, which resulted in Crescent Holdings wholly owning Crescent Resources, and Duke Ventures owning 98% of Crescent Holdings (the remaining 2% going to Fields); (2) "simultaneously" with those transfers, a "distribution of capital" in the amount of $1.187 billion in term loan proceeds from Crescent

Resources to Crescent Holdings and on to Duke; and (3) Duke's sale of a 49% interest in Crescent Holdings to the MSREF investors. Pl.'s Resp. [#181], Ex. 3 (FSA), § 2.2.

The Trust would have the Court ignore everything except the distribution of funds to Duke. Such a reading is contrary to the plain language of the painstakingly crafted contractual documents prepared by the parties. There is simply no factual basis for extracting a single aspect of the 2006 Duke Transaction and analyzing it divorced from its context and relationship to the actual transaction. If the distribution had not been made to Duke, the entire transaction would not have closed. If Duke had simply wanted to extract a payment from Crescent Resources unrelated to the transfers of ownership interests between the four parties to the transaction, it could have done so without adding the payment in as a part of the larger transaction. The Trust suggests Duke's internal accounting of the transaction shows the billion dollar distribution was a strategic decision to avoid tax consequences as opposed to a settlement payment. But Duke's accounting tactics do not alter the nature of the "securities transaction" described by the Formation and Sale Agreement. *See Verizon*, 892 F. Supp. 2d at 809, 824 & n.6 (noting the Verizon–Idearc transaction included a "$2.4 billion cash distribution to Verizon," and characterizing the transaction as a "non-sale 'exchange'" designed to avoid "billions in tax liability").

The cases the Trust cites do not require or support the Trust's myopic view of the 2006 Duke Transaction, either. For example, in *Global Crossing*, the plaintiff sought to recover pure dividend payments; there were no securities exchanged at all. 385 B.R. at 56 & n.1. Similarly, the dividend challenged in *Integra Realty* was a simple exchange of stock "without the receipt of any money or any change in what was owned." 198 B.R. at 360. The court in *Grede* found the alleged settlement payments "were separate transactions unrelated to the completed trade between Citadel and Sentinel

-14-

that is protected by the safe harbor," and refused to apply Section 546(e) on policy grounds. 485 B.R. at 887. Accordingly, in all three cases, there was no basis for viewing the challenged payments as payments to complete a securities transaction. Finally, in *In re Appleseed's*, the court did analyze a dividend payment in a vacuum, removed from its relationship to the entire transaction, but provided no legal explanation for carving up the transaction as it did. 470 B.R. at 302.[3]

Analyzing the distribution of funds to Duke as part of the larger 2006 Duke Transaction is the only view of the facts which can be reconciled with the parties' written agreement. It is also consistent with the broad application of Section 546(e) by numerous circuit courts. *E.g.*, *Frost*, 564 F.3d at 985–86; *Olympic*, 294 F.3d at 742; *In re Resorts Int'l*, 181 F.3d at 515–16. The Court therefore concludes the distribution to Duke should be viewed in the context of the entire transaction, and the Trust's efforts to distinguish *Verizon* and various other cases on the ground this case involved only a one-way dividend payment is unpersuasive. By viewing the payment in context, Crescent's payment becomes a necessary transfer in the completion of the securities transaction described in the Formation and Sale Agreement.

The Trust places great emphasis on its contention Crescent Resources paid the term loan proceeds directly to Duke. Such a transfer would have been contrary to the parties' written agreements, which expressly contemplated a two-stage, indirect transfer (Crescent Resources to Crescent Holdings, then Crescent Holdings to Duke). But the only evidence the Trust cites in support

---

[3] The only authority cited by the district court in *In re Appleseed's* in support of its piecemeal analysis is a decision by the bankruptcy court in the same district. 470 B.R. at 302 (citing *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 500 (Bankr. D. Del. 2010)). However, the *Mervyn's* court also provided no legal basis for applying Section 546(e) to only portions of a more complex transaction. 426 B.R. at 500. For example, the court declared "as a general rule, section 546(e) does not apply to 'collapsed' transactions," but cited no authority. *Id.* Similarly, the court explained it "firmly believes that because of the multiple conveyances made surrounding the 2004 Sale, section 546(e) does not apply," but offered no basis in either the Bankruptcy Code or any relevant body of case law to support such a belief. *Id.*

of its argument Crescent Resources transferred the funds directly is an email with "payment instructions" attached. Pl.'s Resp. [#118], Ex. 9. Consistent with the parties' agreement, those attached instructions contemplate payment of the term loan proceeds to Duke "by Crescent [Resources] (through Holdco [Crescent Holdings])." *Id.* Additionally, just before this payment is made, the instructions contemplate payment of the term loan proceeds by Crescent Resources to Crescent Holdings, even though a separate banking transaction was deemed "not necessary" to accomplish this step. *Id.* These instructions thus confirm what every other written document in the record suggested was supposed to happen, and the Court finds no basis for finding the payment happened as the Trust suggests. But even if it did, the Trust's argument is irrelevant: Section 546(e) merely requires a payment be made to complete a securities transaction, it does not limit payment or receipt to particular parties to a multiparty transaction.[4] *See In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 355–56 (5th Cir. 2012) (refusing to graft trustee's suggested elements into Section 546(e)'s treatment of forward contracts, as the court's task is simply "to apply the statutory provisions as Congress wrote them").

Finally, the Trust asks the Court to "look[] beyond the statute's words," relying on a district court opinion which created a five factor test to determine whether a particular transfer is a settlement payment. Pl.'s Resp. [#118], at 18 (discussing *In re Adler*, 263 B.R. 406, 475–83

---

[4] The Trust's response implies Section 546(e) cannot apply because Crescent Resources did not receive reasonably equivalent value for its payment to Duke. But Section 546(e) by its plain terms exempts even those transfers which were fraudulent. *In re Lancelot Investors Fund, L.P.*, 467 B.R. 643, 655 (Bankr. N.D. Ill. 2012), *aff'd sub nom. Peterson v. Somers Dublin Ltd.*, 2013 WL 4767495 (7th Cir. Sept. 6, 2013) ("The problem for the Trustee is that Congress decided to protect constructive fraudulent transfers, transfers where the consideration is not reasonably equivalent.").

(S.D.N.Y. 2001)). Whatever vitality these factors have in the Second Circuit,[5] they are not binding on this Court. Further, the Fifth Circuit has joined numerous other circuits in applying Section 546(e) as written, notwithstanding congressional dialogues about the provision's purposes. *See Olympic*, 294 F.3d at 742 (reading the term "settlement payment" broadly and rejecting trustee's attempt to graft extra-textual limitations onto the term, including one of the limits suggested by *Adler*); *see also Peterson v. Somers Dublin Ltd.*, 2013 WL 4767495, at *6 (7th Cir. Sept. 6, 2013) ("The text is what it is and must be applied whether or not the result seems equitable. . . . Statutes often are written more broadly than their genesis suggests. . . . We apply the text—which both Houses of Congress approved and the President signed—not themes from a history that was neither passed by a majority of either House nor signed into law."); *Frost*, 564 F.3d at 986 (refusing to read into Section 546(e) an extra-textual requirement the stock transferred be publicly traded).[6]

The Court concludes Crescent Resources' distribution (through Crescent Holdings) of the term loan proceeds to Duke was a settlement payment within the meaning of Section 546(e) because it was made to complete a securities transaction, namely the 2006 Duke Transaction. Section 546(e) thus precludes the Trust from recovering the transfer of the term loan proceeds, and Duke is entitled to summary judgment on this basis.

---

[5] *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 335 (2d Cir. 2011) (finding "nothing in the Bankruptcy Code or the relevant caselaw that supports Enron's proposed limitations on the definition of settlement payment," several of which mirrored the factors set forth in *Adler*).

[6] The leading treatise recognizes the trend to broadly interpret Section 546(e) despite Congress's shop-floor discussions about the purposes of the provision. *See* COLLIER ON BANKRUPTCY P 741.07 ("Although there is evidence that Congress intended to limit the types of transactions protected from avoidance by section 546(e) of the Bankruptcy Code to transactions that occur in the public securities markets rather than in situations where no public trading and no intermediary are involved, several recent decisions have extended the definition of settlement payment to include strictly private payments in connection with leveraged buyouts of privately-held companies with no clear implications in the wider financial markets." (footnotes omitted)).

**2.     Securities Contract Exemption**

Alternatively, Duke contends Section 546(e) exempts the transfer because it was "a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract." 11 U.S.C. § 546(e). Advancing essentially the same argument as before, the Trust argues Section 546(e) does not apply because the transfer from Crescent Resources to Duke was a one-way dividend payment unconnected to any securities contract.

Section 546(e) incorporates by reference the Bankruptcy Code's definition of "securities contract," which is a twelve-paragraph behemoth. *See* 11 U.S.C. § 741(7). At the most basic level, the definition includes "a contract for the purchase, sale, or loan of a security." *Id.* § 741(7)(A)(i). As one bankruptcy court recently explained, "[t]he plain language of section 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities . . . and a wide array of related contracts." *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 438 (Bankr. S.D.N.Y. 2012). Similarly, Section 546(e)'s "in connection with" language "is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'" *In re Lancelot Investors Fund*, 467 B.R. at 656 (quoting *In re Casa de Cambio Majapara S.A. de C.V.*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008)).

The Trust does not take issue with Duke's interpretation of these statutory terms, but instead repeats its argument the distribution of the term loan proceeds to Duke should be viewed as a standalone dividend payment. For the reasons discussed above, the Court refuses to conceptually sever the term loan proceed transfer from the rest of the 2006 Duke Transaction. Crescent's distribution of funds to Duke was certainly "in connection with" a securities contract; the Trust does

-18-

not argue the 2006 Duke Transaction—which called for the exchange of securities between Duke, Crescent Resources, Crescent Holdings, and MSREF—was anything else.

Additionally, Crescent's distribution payment was "related to" this same agreement—the Formation and Sale Agreement—which provided for the sale of a 49% stake in Crescent Holdings to MSREF for approximately $414 million. The Formation and Sale Agreement calculated the price MSREF would pay for its interest by deducting, among other things, the term loan proceeds (which it acknowledged were being distributed to Duke) from the estimated value of Crescent Holdings. FSA, Ex. G. Crescent's distribution is thus intricately "related to" this sale of securities, as the sale price was dependent upon the distribution occurring. If those funds had not been passed on to Duke, MSREF would presumably have been required to pay an additional $581 million (roughly 49% of the term loan proceeds total).

The Trust renews its reliance on the same line of cases discussed above regarding piecemeal analysis of transactions, but the Court remains unpersuaded by the Trust's reading of those cases. Half of the cases cited by the Trust involved only the settlement payment prong of Section 546(e), and thus are particularly irrelevant to the separate securities contract exemption. *In re Appleseed's*, 470 B.R. at 301–02 ("securities contract" prong not discussed); *Mervyn's*, 426 B.R. at 499–500 ("securities contract" prong not discussed). Those cases which did discuss the securities contract prong are both unhelpful and distinguishable because they involved fundamentally different kinds of contracts. *See Grede*, 485 B.R. at 887 (assuming the requirements of Section 546(e)'s "settlement payment" and "securities contract" prongs were literally met, but refusing to apply them on policy grounds); *In re Qimonda Richmond, LLC*, 467 B.R. 318, 323 (Bankr. D. Del. 2012) (holding bonds, which are never mentioned in Section 741(7), do not qualify as "securities contracts").

The Court concludes Crescent Resources' distribution (through Crescent Holdings) of the term loan proceeds to Duke was a transfer made "in connection with" a securities contract. Section 546(e) thus precludes the Trust from recovering the transfer of the term loan proceeds, and Duke is entitled to summary judgment on this basis.

**B.      Section 544(b)(1) and Duke's State-Law Defenses**

Solely in the alternative, the Court turns to Duke's second argument. The Trust brings its state-law claims against Duke via Section 544(b)(1). When asserting a cause of action under Section 544(b)(1), "[t]he trustee's rights are derivative of an actual unsecured creditor's rights, meaning that the trustee steps into the shoes of the creditor." *ASARCO*, 396 B.R. at 326. Because the Trust steps into the shoes of the particular creditor whose allowable, unsecured claim provides the basis for bringing the cause of action, the Trust "is also subject to defenses that could be asserted against the unsecured creditor." *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D. Tex. 2007) (citing *In re Marlar*, 252 B.R. 743, 754 (B.A.P. 8th Cir. 2000), *aff'd*, 267 F.3d 749 (8th Cir. 2001)).

Duke argues the Trust cannot recover the distribution of the term loan proceeds to Duke on behalf of the Class B creditors—the original lending banks and their successors—because state law prohibits those banks from recovering in their own right. Because the Trust is subject to any defenses applicable to a particular creditor's claim, Duke contends the Trust's efforts to recover on behalf of the Class B creditors are barred by numerous state-law defenses such as consent, ratification, equitable estoppel, and *in pari delicto*.

The Trust first responds by claiming the confirmation of the Plan, which included Class B claims, operates as res judicata of the allowability of those claims and therefore precludes Duke from asserting its state-law defenses against the Class B creditors. The Trust's argument stems from the

Bankruptcy Code itself: "the provisions of a confirmed plan bind the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan." 11 U.S.C. § 1141(a). By operation of § 1141(a), confirmed plans are generally treated as equivalent to final judgments. *Eubanks v. F.D.I.C.*, 977 F.2d 166, 171 (5th Cir. 1992). Accordingly, "'a plan is binding upon all parties once it is confirmed and all questions which could have been raised pertaining to such plan are res judicata.'" *Id.* (quoting COLLIER ON BANKRUPTCY P 1141.01[1] (15th ed. 1992)).

Although the Trust is right about the effect of a confirmed plan in general, it stretches § 1141(a) too far when it claims Duke simply cannot defend against allowed claims because the Plan allowed them in the first place. As the Fifth Circuit recognized in *Eubanks*, only those questions which could have been raised during the plan confirmation process are resolved by the confirmation of the plan. *Id.*; *see also In re Enewally*, 368 F.3d 1165, 1173 (9th Cir. 2004) ("Although confirmed plans are *res judicata* to issues therein, the confirmed plan has no preclusive effect on issues that must be brought by an adversary proceeding, or were not sufficiently evidenced in a plan to provide adequate notice to a creditor.").

The plan confirmation process was not the forum for litigating the merits of the Trust's fraudulent transfer claims. The Bankruptcy Code encourages "quick and equitable reorganization" by authorizing post-confirmation litigation (e.g., Section 544(b) suits) rather than requiring debtors to "delay filing plans of reorganization until completing all potential litigation." *See In re Mirant Corp.*, 675 F.3d 530, 534 (5th Cir. 2012) (internal quotation marks omitted). Confirming a plan which allows a particular claim does not mean the debtor need only file suit to collect its judgment because the defendant cannot defend against the claims. As one bankruptcy court recognized in

-21-

rejecting a similar argument seeking to use a plan confirmation as a sword in a subsequent adversary proceeding, "both the factual underpinnings and theory of an avoidance action are completely different than a determination on the allowability and proper treatment of a creditor's claim under a plan of reorganization." *In re USN Comm'cns, Inc.*, 280 B.R 573, 587 (Bankr. D. Del. 2002) (internal quotation marks omitted); *see also Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir. 1995) ("In other words, '[i]f an issue must be raised through an adversary proceeding it is not part of the confirmation process and, unless it is actually litigated, confirmation will not have a preclusive effect.'" (quoting *In re Beard*, 112 B.R. 951, 956 (Bankr. N.D. Ind. 1990))). Duke may thus assert its various state-law defenses against the Trust's fraudulent transfer actions notwithstanding the allowability of the Trust's claims in the confirmed Plan.

Duke raises four distinct state-law defenses, though all four reduce to the same basic idea: the original lending banks entered into the 2006 Duke Transaction with full knowledge of how the term loan proceeds would be distributed, and cannot now claim the transfer they freely negotiated, participated in, and funded was fraudulent. The Trust does not seriously contest the general applicability of consent, ratification, and equitable estoppel as state-law defenses in North Carolina.[7] *See Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 881–82 (N.C. 2004) (recognizing defense of quasi-estoppel, whereby "a party who accepts a transaction . . . and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same

---

[7] The Trust does cite one bankruptcy court case for the proposition "[c]ourts generally have not applied common law equitable defenses to causes of action created under Chapter 5 of the Bankruptcy Code." *In re Automotive Prof'ls, Inc.*, 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008). But the footnote at the end of the same sentence the Trust quotes states "[t]he only exception is with respect to § 544(b), which allows a trustee to assert the claims of a creditor and specifically incorporates state law." *Id.* at 262 n.1.

transaction"); *Link v. Link*, 179 S.E.2d 697, 706 (N.C. 1971) (recognizing defense of ratification); *Webb v. Gaskins*, 121 S.E.2d 564, 571 (N.C. 1961) (recognizing defense of consent).

The evidence Duke presents in support of its defense theory is substantial. First, the contractual documents drafted and executed by the original lenders disclose the disbursement of the term loan proceeds directly to Duke. *See* Def.'s App'x [#158-3], Ex. C-1 (Credit Agreement), §§ 1.01, 5.01, 7.11 (disclosing and requiring the term loan proceeds be distributed to Duke); FSA at 1–2 (reciting the distribution of the term loan proceeds to Duke). Representatives of Bank of America have testified they understood the term loan proceeds would be distributed to Duke. *See* Def.'s App'x [#158-10], Ex. I, at 44–45 (Bank of America Senior Vice President Susan Vercauteren testifying she and her financing team understood the term loan proceeds were to be distributed to Duke); *id.* [#158-11], Ex. J, at 84–85 (Bank of America Securities Managing Director Dan Teper testifying he knew the term loan proceeds would be immediately distributed to Duke, and assuming "everyone on the team knew that" because "[i]t would be in all the documentation"); *id.* [#158-12], Ex. K, at 20 (Bank of America Vice President of Loan Syndication Brent Bowman testifying he understood the term loan proceeds would be distributed to Duke). Similar statements were obtained from various Morgan Stanley representatives. *Id.* [#158-13, 14, 15], Exs. L, M, N (deposition excerpts).

In addition to understanding the terms of the agreement at the outset, the original lenders took further steps inconsistent with the idea they were defrauded. When the original lenders offered to sell portions of the debt to the syndicate investors, the lenders prepared and provided an Offering Memorandum which again disclosed the term loan proceeds were distributed to Duke. *Id.* [#158-16], Ex. O, at 11; *see also id.* [#158-12], Ex. K, at 135–36 (Bowman recalling Bank of America's

"standard practice" was to distribute an offering memorandum prior to meeting with potential investors). In documents filed with the Bankruptcy Court, the original lenders obtained stipulations from the Debtors indicating the 2006 Credit Agreement (as amended by the parties in 2008) was legal, binding, and enforceable. *Id.* [#158-18], Ex. Q (Final DIP Order) ¶¶ H(1)–(4).

The Trust does not dispute any of this evidence. Instead, the Trust claims the original lenders were hoodwinked by Duke because the valuation model Duke employed to determine the value of Crescent Resources (and therefore Crescent Holdings) was flawed in ways Duke knew but failed to disclose to the lenders. As evidence of this, the Trust offers a single email sent by a Charles Wilson, who the Trust represents was a Duke employee. Pl.'s Resp. [#181], Ex. 26. In this email, Wilson notes a "revised budget" he expected to be prepared approximately three months after the 2006 Duke Transaction closed would "look quite different than the forecast we provided" to the original lenders. *Id.* This lone email is no evidence the original lenders were misled or defrauded in any material way.[8] At most, the email shows, as Wilson explains, Crescent's economic forecast had changed significantly since the closing occurred: "We have lost much of the cushion we represented at Closing and the margin for error has been reduced." *Id.* The Court sees absolutely no basis to extrapolate from this two-paragraph email a genuine dispute as to whether the original lenders were defrauded. The Court's conclusion is bolstered by Duke's evidence to the contrary: multiple representatives of both original lenders expressly testifying they were not defrauded in the 2006 Duke Transaction. Def.'s App'x [#158-10], Ex. I, at 46–47 (Vercauteren testimony); *id.* [#158-12],

---

[8] In its Letter Brief, the Trust also points to a second email exchange in which a Morgan Stanley employee suggests Crescent Resources's reliance on revenue from a particular development project "is clearly going to be a problem." Pl.'s Resp. [#181], Ex. 32. This email also does not suggest Morgan Stanley or Bank of America were deceived or misled. To the contrary, it shows Morgan Stanley was knowledgeable about the valuation model and revenue projections being used and actively sought out information from Crescent Resources personnel when questions or concerns arose.

Ex. K, at 22–24 (Bowman testimony); *id.* [#158-13], Ex. L, at 111–13 (testimony of Christopher Whelan, Managing Director of Morgan Stanley Senior Funding); *id.* [#158-15], Ex. N, at 69–70 (testimony of Peter Harned, Executive Director of Morgan Stanley's United States real estate investing division).

Whether the defense is consent, ratification, or estoppel, the undisputed evidence shows the original lending banks participated in the 2006 Duke Transaction with full knowledge of the transaction they helped design. After the transaction had closed, the original lenders continued to bless the deal, disclosing its terms in subsequent syndication offerings, amending the credit agreement so crucial to the entire transaction, and representing to the Bankruptcy Court the transaction was valid. Finally, the original lenders unquestionably benefitted from the transaction they participated in, through fees and payments extracted from Crescent Resources and syndicate lenders. To allow the Trust to step into the original lenders' shoes and set aside the billion dollar transfer as fraudulent would bail out the lenders who knew the terms of their own deal and have never asserted they were defrauded in any way. Congress may be in the business of bailing out banks, but this Court is not. The Trust cannot use the Class B creditors to recover the distribution of the term loan proceeds to Duke.[9]

---

[9] The Trust dedicated several pages of its brief, and much of its time at the hearing, to its argument the syndicate lenders were defrauded. The summary judgment record plainly shows they were not, as each syndicate lender was required to sign an Assignment and Assumption Agreement which disclosed the terms of the 2006Duke Transaction, expressly disclaimed any reliance on the original lenders' representations, and indicated the syndicate lender was basing its decision solely on its own independent analysis. *E.g.*, Def.'s App'x [#158-22], Ex. U. The Trust suggests some syndicate lenders received their interests via "purchase" rather than "assignment," but offers no evidence to support this point. The syndicate lenders took their assignments of portions of the debt subject to whatever defenses could be asserted against the assignor (the original lenders), and thus could not maintain their own state law suits to set aside the transfer as fraudulent. *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010).

This story does not end with the Class B creditors, however. Duke concedes the Class A creditors may also avoid the transfer of the term loan proceeds to Duke, but argues their recovery must be limited to the amount of the Class A claims. *See* Def.'s Mot. Summ. J. [#157], at 15 ("[T]he Trust can avoid the transfers (if the Trust can prove its case) only to the extent necessary to satisfy the Class A claims."); Def.'s Reply [#185], at 14–15 (arguing "the Class A creditors could avoid the transfer only to the extent necessary to satisfy their claims").

In response, the Trust invokes the rule of *Moore v. Bay*, 284 U.S. 4 (1931) (Holmes, J.). In *Bay*, the Court interpreted the precursor to Section 544(b)[10] to allow the trustee to recover the full value of an avoided transfer for the benefit of the estate, even if the claim being asserted was for significantly less. *Id.* at 4. As explained by one leading treatise:

> In other words, an entire transfer can be set aside even though the creditor's claim is nominal and even though the avoidance may provide more funds than necessary to pay the creditors and the administrative expenses of the case. Moreover, the recovery of the trustee is for the benefit of all creditors including those who had no right to avoid the transfer.

COLLIER ON BANKRUPTCY P 544.06[4] (footnotes omitted). The Fifth Circuit still follows the rule, as it recently explained:

> If an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and "avoid" the debtor's transfer. Although the cause of action belonged to one creditor, any property the trustee recovers becomes estate property and is divided *pro rata* among all general creditors. The trustee may recover the full extent of the fraudulently transferred property on the basis of one creditor's claim. [*Bay*, 284 U.S. at 4]. "In other words, an entire transfer may be set aside even

---

[10] Duke attempts to distinguish *Bay* on the grounds it interpreted Section 70e of the Bankruptcy Act, which is not identical to Section 544(b). However, the Committee Reports on the modern Bankruptcy Code indicate *Bay*'s rule was intended to be retained. COLLIER ON BANKRUPTCY P 544.06[4]; *see also In re JTS Corp.*, 617 F.3d 1102, 1112 (9th Cir. 2010) (briefly recounting the history of *Moore v. Bay* and Section 544(b)).

though the creditor's claim is nominal." 5 COLLIER ON BANKRUPTCY ¶ 544.09[5] (15th ed. rev. 2009).

*In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010); *see also Mirant*, 675 F.3d at 534 (quoting the same passage from *Moore*).

If this result strikes Duke as bizarre—and it certainly does—it is with good reason. The decision in *Bay* has been described as "one of the most controversial in the entire field of bankruptcy law." COLLIER ON BANKRUPTCY P 544.06[4]. Allowing a creditor with a nominal claim to avoid and thereby recover the full value of a transfer seems to embrace windfalls. The results are even more absurd when, as contemplated by the rule, the recovery goes to benefit other creditors who could not have avoided the transfer themselves, perhaps because they were complicit in the fraud. But this is what the Bankruptcy Code requires, and it is therefore possible for the Trust to avoid the entirety of the transfer to Duke on the basis of even a single creditor from Class A whose claim is not defeated by the defenses applicable to the original lending banks. *See Moore*, 608 F.3d at 260; *see also Abramson v. Boedeker*, 379 F.2d 741, 748 n.16 (5th Cir. 1967) ("[I]f the transfer is avoidable at all by any creditor, it is avoidable in full for all creditors regardless of the dollar amount of the prevailing claim.").

Duke thus loses the battle on Section 544(b), but argues it may still win the war because the power to avoid is not the same as the power to recover. *See JTS*, 617 F.3d at 1113 ("[E]ven if there is a right to avoid a transfer, it does not mean that a right to recover on every transfer is automatic."); *In re Int'l Admin. Servs.*, 408 F.3d 689, 703 (11th Cir. 2005) ("In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof."). The relevant limit comes from Section 550(a) of the Bankruptcy Code, which reads, in

relevant part: "to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Duke contends this Court can and should use the equitable power of Section 550(a) to preclude the Trust from recovering the portion of the transfer destined for the Class B creditors.

There is precious little guidance from the Fifth Circuit on the scope of Section 550(a)'s "for the benefit of the estate" language. Other courts generally interpret the language broadly. *See In re Acequia, Inc.*, 34 F.3d 800, 811 (9th Cir. 1994); *In re Tronox Inc.*, 464 B.R. 606, 617 (Bankr. S.D.N.Y. 2012) (citing *Acequia*, 34 F.3d at 811). Still, there are numerous examples of cases where courts have denied or limited recovery based on the equitable principles underlying the Bankruptcy Code and Section 550(a) in particular. *See, e.g.*, *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991) (affirming district court's order holding debtor's avoidance action was not "for the benefit of" the estate); *In re Yellowstone Mountain Club, LLC*, 436 B.R. 598, 678 (Bankr. D. Mont. 2010) (refusing to award any recovery to the original lender who was complicit in the fraudulent transfer, as well as syndicate lenders "who have speculated on a monumental award against" the plaintiff); *In re Jackson*, 318 B.R. 5, 27–28 (Bankr. D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) (because "equity guards against windfalls in general," amount of recovery through Section 550(a) on a Section 544(b) claim may be equitably adjusted); *but see Tronox*, 464 B.R. at 614 (collecting cases interpreting Section 550(a) as setting "a minimum floor for recovery in an avoidance action," but not "any ceiling on the maximum benefits that can be obtained once that floor has been met").

The one consistent vein traveling through all of these cases is the fact-specific nature of the inquiry. *E.g.*, *Wellman*, 933 F.2d at 218 ("benefit of the estate" question requires "a case-by-case,

-28-

fact-specific analysis"); *In re Murphy*, 331 B.R. 107, 121 (Bankr. S.D.N.Y. 2005) (limiting recovery under Section 550 based on the "extremely unusual" facts of the case). It is therefore instructive to consider the factual circumstances of this case, and the equitable impact of the Trust's potential recovery.

When the original lenders provided Crescent Resources with $1.2 billion, they had full knowledge those funds would leave Crescent Resources and flow directly to Duke. Those same lenders deny they were defrauded or misled is any way during the process of negotiating, drafting, and ultimately closing on the 2006 Duke Transaction. The lenders made the loan to Crescent Resources without any guarantee of payment from Duke or Crescent Resources. Under the terms of this nonrecourse loan, the lenders were entitled to take ownership of the Crescent enterprise and its substantial real estate holdings in the event of a default. As a result of the Crescent bankruptcy, the lenders have received the benefit of their bargain: the confirmed Plan gives the Class B creditors (the lenders and their successors) full ownership of Crescent Holdings. In addition, the lenders extracted several hundred million dollars in payments on the loan from Crescent Resources between the execution of the loan and the bankruptcy filing.

If the Trust is allowed to recover the $961 million of the term loan proceed transfer destined for the Class B creditors—a group of creditors who all derive their interest in the estate from the original lenders—the banks' high risk investment will pay off in the form of a massive windfall. Not only will the banks (and their successors) walk away with ownership of Crescent and several hundred million dollars in loan payments, they will recoup the bulk of the loan they made with full

knowledge of the risk. In essence, the lenders will have stolen Crescent Resources from Duke,[11] and will face no prospect of liability for their actions because the Plan expressly released them from all claims. Having made off like bandits, the banks will no doubt continue to engage in reckless lending behavior, satisfied the courts will intervene to save them from their bad bets in the future.

  The troubling nature of such a recovery is further revealed by the creditor classes in this case. As explained above, if the Class B creditors were the only creditors with fraudulent transfer claims, the Trust would recover nothing; those creditors are estopped from challenging the transfer they designed from the ground up. The question thus becomes whether the presence of Class A creditors—entities with no direct connection to the term loan proceed distribution—justifies rewarding the Class B creditors with funds they could never recover on their own. Recovery of the Class B creditors' claims "would be for the benefit of a sub-set of the estate, which is facially inconsistent with § 550(a)." *In re Enron Corp.*, 319 B.R. 128, 133 (S.D. Tex. 2004). There is no equitable basis for allowing such a recovery in this case. *See Yellowstone*, 436 B.R. at 677–78 (using Section 550(a) to preclude recovery for the original lender and the pre-petition lenders).[12] Finally, because the Trust's Section 544(b)(1) claim is based on state law, the Trust's recovery (through

---

  [11] To some extent, this result does seem like Duke getting its just deserts. But even though Duke's hands appear anything but clean in this ordeal, fraudulent transfer law is designed to be "remedial[] rather than punitive." *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994). In truth, it makes no more sense to reward Duke (by denying recovery) than it does to reward the banks (by allowing recovery). The goal is, ultimately, to make the *estate* whole. *JTS*, 617 F.3d at 1111. The trouble arises when the estate is comprised primarily of claims derivative of a wrongdoer with no independent right to recovery, particularly when the wrongdoer has been released from liability by the confirmed plan.

  [12] In *Yellowstone*, as here, various syndicate lenders bought into the original lender's loan product despite having "access to the underlying Credit Agreement," which disclosed the dangerous destiny of the loan proceeds, and despite knowing the loan "was nonrecourse." 436 B.R. at 677. Also like this case, the original lender, Credit Suisse, negotiated a release of claims against it and arranged for a litigation trust to step in and assert claims on its behalf. *Id.* at 677–78. While it is true Credit Suisse was more involved in both the creation and control of the litigation trust in *Yellowstone* than the original lenders are in this case, the end result is the same: the original lender is protected from liability and allowed to speculate through the trust on the possibility of a windfall recovery which would effectively convert a nonrecourse loan into a recourse loan.

Section 550(a)) is similarly limited by the recovery allowed under state law, which in this case would be the amount of the Class A claims. *See* N.C. GEN. STAT. § 39-23.7(a)(1) (creditor may avoid a transfer "to the extent necessary to satisfy the creditor's claim"); *id.* § 39-23.8(b) (successful "creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, *whichever is less*" (emphasis added)). Accordingly, even if the Trust's claims were not exempted by Section 546(e), this Court would limit any recovery pursuant to Sections 544(b)(1) and 550(a) to the amount necessary to satisfy the claims of the Class A creditors.

## III.   Fields's Motion

The Trust brings three claims against Fields: (1) wrongful distribution; (2) breach of fiduciary duty; and (3) civil conspiracy. Fields contends he is entitled to summary judgment on all three claims.

### A.   Wrongful Distribution

The Trust's wrongful distribution claims allege Fields (and others, including Duke and the other board members of Crescent Resources) approved a wrongful distribution by signing off on the transfer of the term loan proceeds from Crescent Resources to Duke. 2d Am. Compl. [#114] ¶ 217. The Trust alleges its wrongful distribution claims are brought "[u]nder applicable state law," which includes, "but [is] not limited to," claims brought under Delaware, Texas, Georgia, and North Carolina law. *Id.* ¶¶ 217–18 & n.14.

Enter the glaring choice-of-law problem. The Fifth Circuit "has not determined whether the independent judgment test or the forum state's choice-of-law rules should be applied in bankruptcy." *Mirant*, 675 F.3d at 536; *see also Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981) ("Both the Supreme Court and this circuit have taken care

to avoid resolving this question in the context of the Bankruptcy Act."). The forum state in this

action, Texas, "uses the *Restatement*'s 'most significant relationship' test to decide choice-of-law

issues." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). But because the independent

judgment test and the most significant relationship test[13] are "essentially synonymous," this Court's

resolution of the choice-of-law question should be the same regardless of which test applies. *Mirant*,

675 F.3d at 536 (internal quotation marks omitted).

Fields contends Georgia law should apply to the wrongful distribution claim. Fields's

argument, in its entirety, is as follows:

> [Crescent] Resources is a Georgia limited liability company. Each of the
> Trust's claims against Mr. Fields arises out of his role as manager and chief executive
> officer of [Crescent] Resources. No other state has a more significant relationship to
> the parties and the transaction than does Georgia. Therefore, Georgia law applies to
> these claims.

Fields's Mot. Summ. J. [#165], at 10. Accordingly, Fields argues, Georgia's two-year statute of

limitations applies and bars prosecution of the Trust's wrongful distribution claims. *See* GA. CODE

§ 14-11-408(c).

The Trust argues North Carolina law applies under the most significant relationship test.

Crescent Resources is a Georgia LLC, but has no apparent contacts or relationship with Georgia

aside from its legal formation. Fields admits Crescent Resources' principal place of business is in

---

[13] The most significant relationship test is drawn from Sections 6 and 145 of the Restatement. Section 6 provides
the following factors to consider: "(a) the needs of the interstate and international systems, (b) the relevant policies of
the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination
of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field
of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law
to be applied." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971). Section 145 provides "[c]ontacts to be taken
into account in applying the principles of § 6," including "(a) the place where the injury occurred, (b) the place where
the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of
business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* § 145.

North Carolina, where Fields worked. North Carolina also happens to be the headquarters of Duke, and is thus central to the transaction at the heart of this dispute.

The Court finds the Trust has the better of the choice-of-law arguments here. Considering the various factors set forth in the Restatement, North Carolina has a more significant relationship to the 2006 Duke Transaction than does Georgia. Looking first to Section 145, North Carolina is where Duke, Crescent Resources, and Fields were all based. The injury in this case flowed primarily from an agreement executed by those North Carolina-based parties.[14] Crescent Resources is incorporated in Georgia, but maintains its principal place of business in North Carolina, where Duke is also headquartered. Finally, the relationship between these parties (Duke, Crescent Resources, Fields, and the other Crescent Resources managers) is certainly "centered" in North Carolina. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(d). The Section 145 contacts thus favor North Carolina over Georgia law. *See Askanase v. Fatjo*, 130 F.3d 657, 671 (5th Cir. 1997) ("Here, LivingWell's only tie with Delaware is that it was incorporated there; however, its principal place of business was in Texas, the challenged payments were made from Texas, LivingWell's board met in Texas, and LivingWell's principal asset, the Houstonian, was in Texas. Therefore, we affirm the district court's holding that Texas law and not Delaware law applies.").

The Section 6 analysis also favors North Carolina over Georgia. In particular, applying North Carolina law (which has a slightly longer statute of limitations) would better achieve one of the "basic polic[ies]" underlying both the Bankruptcy Code and state fraudulent transfer law, which is

---

[14] The Fifth Circuit has explained "fraudulent transfer laws are more concerned with helping injured parties than deterring conduct," and thus the location of the creditors may be more important than the location of the defendants. *Mirant*, 675 F.3d at 537. Here, the injured debtors are numerous and not centralized in any particular state, but "the conduct causing the injury" originated in North Carolina with Duke, Crescent Resources, and Fields. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(b).

"the protection of creditors from fraudulent transfers." *Mirant*, 675 F.3d at 537 (applying New York rather than Georgia fraudulent transfer law). Georgia does have an interest in seeing its law applied to LLCs formed in Georgia, but the relevant policy difference here is a mere one-year difference in the statute of limitations, not a substantive difference in fraudulent transfer law. Moreover, the application of North Carolina law does nothing to frustrate the primary protection offered to Fields by the LLC Agreement, the exculpation clause.

The Court thus concludes North Carolina has the "most significant relationship" to the Trust's wrongful distribution claims, and North Carolina law should apply to those claims, even against a Georgia LLC. The Court therefore rejects Fields's statute-of-limitations argument based on an inapplicable Georgia statute and declines to grant summary judgment for Fields on this claim.

## B.     Breach of Fiduciary Duty

Fields also moves for summary judgment[15] on the Trust's breach of fiduciary duty claims. The Trust asserts these claims "under applicable state law" as well, which means North Carolina law based on the choice-of-law analysis above. However, both Georgia and North Carolina appear to have followed the lead of Delaware in adopting the standard theories of corporate director liability, including the relevant duties of loyalty, care, and good faith, and the "business judgment rule." *See, e.g., Morris v. Hennon & Brown Props., LLC*, No. 1:07CV780, 2008 WL 2704292, at *5 (M.D.N.C. July 3, 2008); *Argentum Int'l, LLC v. Woods*, 634 S.E.2d 195, 203 & n.29 (Ga. App. 2006). Similarly, North Carolina follows the traditional rule holding the business judgment rule does not

---

[15] Somewhat confusingly, Fields's arguments are couched in the language of Rule 12, and even cite pleading-standard cases such as *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). The Court applies the typical summary judgment standard to Fields's self-described "Motion for Summary Judgment," notwithstanding the Rule 12 references.

apply to self-dealing or conflicted directors who stand on both sides of a transaction. *In re Brokers, Inc.*, 363 B.R. 458, 473–74 (Bankr. M.D.N.C. 2007).

Fields contends he is protected by both the exculpation clause in the LLC Agreement and by the business judgment rule, and cannot be held liable for making a reasonably informed decision to approve the 2006 Duke Transaction on behalf of Crescent Resources. In other words, Fields claims he was at most merely negligent, but did not act with the heightened state of mind necessary to find him liable in light of the exculpation clause. The summary judgment record, however, raises substantial questions as to whether Fields, as a self-interested director with a financial stake in the approval of the transaction, can even take advantage of the exculpation clause or the business judgment rule. But even if he can, there are significant factual disputes relevant to whether his conduct was merely negligent or something more. For example, the summary judgment record suggests Fields may not have been entitled to the full $55 million offer Duke created and then allegedly used as leverage to give Fields a financial stake in the 2006 Duke Transaction. It also raises the possibility Fields, as a seasoned manager with decades of experience in the industry, knew better than to approve a distribution of more than one billion dollars to Duke based on the economic forecast for Crescent Resources at the time. Fields cannot obtain summary judgment on these claims by simply professing in an affidavit he acted in good faith. *See Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005) ("These types of determinations, which involve the summary judgment movants' state of mind, are particularly ill-suited for summary judgment."). The Court therefore denies Fields's motion for summary judgment on this claim.

## C.   Civil Conspiracy

Fields argues he is entitled to summary judgment on the Trust's civil conspiracy claim because he is not liable for any underlying tort, namely wrongful distribution or breach of fiduciary duty. Because the Court has denied Fields's motion for summary judgment on those causes of action, the Court similarly denies Fields's motion on this ground.

## Conclusion

Duke has shown it is entitled to summary judgment on both alternative grounds asserted in its motion. Numerous fact issues remain with respect to the claims against Fields, and summary judgment is not appropriate on the Trust's claims against him. Finally, at the hearing, the Court explained its standard procedure for handling all *Daubert* objections at trial. Those motions will therefore be dismissed without prejudice to re-urging the motions at the appropriate time.

Accordingly,

IT IS ORDERED that Duke Energy Corporation, Duke Ventures, LLC, and Spectra Energy Capital, LLC's Motion for Summary Judgment [#157] is GRANTED;

IT IS FURTHER ORDERED that Duke's Motion for Leave to Exceed Page Limit [#184] is GRANTED;

IT IS FURTHER ORDERED that the Trust's Motion for Leave to File Sealed Document [#193] is GRANTED;

IT IS FURTHER ORDERED that Defendant Arthur W. Fields's Corrected Motion for Summary Judgment [#165] is DENIED;

IT IS FINALLY ORDERED that the eleven pending *Daubert* motions (Motions to Exclude Expert Testimony) [##122, 123, 124, 129, 133, 134, 135, 137, 162, 178, 179] are DISMISSED WITHOUT PREJUDICE to re-urging the motions at the appropriate time during trial.

SIGNED this the 4th day of October 2013.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE